## MASSAY et al. v. STUDER, County Attorney.
### (No. 3150.)

Court of Civil Appeals of Texas. Amarillo.
Oct. 31, 1928.

Rehearing Denied Nov. 28, 1928.

A. A. Ledbetter and W. Sherman White, both of McLean, for appellants.

John F. Studer, Chas. C. Cook, W. M. Lewright, D. N. Tracy, Don Wakeman, M. H. Gordon, F. A. Cary, and Wm. J. Smith, all of Pampa, Ben S. Baldwin, of Fort Worth, and Carl McLynn, Henry L. Jordan, H. Otto Studer, and S. D. Stennis, all of Pampa, for appellee.

RANDOLPH, J. This action was brought by D. N. Massey and others against John F. Studer, county attorney of Gray county, contesting the validity of an election held in Gray county, Tex., on the 9th day of March, 1928. The purpose of the election was to determine whether or not the county seat should remain at Le Fors or be removed to Pampa. The election resulted in two-thirds of the votes in said election being cast for Pampa for the location of such county seat.

On trial before the court, without the intervention of a jury, judgment was rendered against contestants, the trial court holding that the election held on March 9, 1928, was a legal and valid election, and permitting the removal of the county seat to Pampa. From such judgment, appeal has been taken to this court to have the proceedings in the trial court reviewed.

The appellants attack the judgment of the trial court as being erroneous for the following reasons:

"Where a county seat election was held under the provisions of the Revised Statutes of Texas which at the time of said election provided that the proposition could not be voted on again for five years, an attempted election on the same proposition held less than three years after the first election is untimely and unauthorized by law and illegal and invalid. * * *

"Where the voters of a county vote on the proposition of the removal of the county seat at a time when the law provides that the same question cannot be voted on again in that county for five years, an amendment to the law changing the time within which said county seat proposition can again be voted on does not affect that particular county which had voted on the proposition under the old law, until five years shall have elapsed since the holding of said first election in that county, the Legislature being powerless to add to or take from any of the material conditions under which the county expressed its will through its voters in the first election."

An election was held on March 19, 1925, for the location or removal of the county seat of Gray county, at which election it was voted by the electors of that county for such county seat to remain at Le Fors. The appellants contend that such election definitely settled the county seat location for a period of five years from the date thereof, and that no legal election, for the purpose of removal

of the county seat of said county, could be held within that period.

Article 1600 of the Revised Civil Statutes 1925, provides as follows:

"When such entry has been made, the county seat, if the election be held to move the county seat from a point within five miles of the geographical center, to a point more or less than five miles from the geographical center, or from a point more than five miles from the geographical center, to any other point more than five miles from such center, shall be removed to the place receiving the votes of two-thirds of all the electors voting on the subject; and such place shall thereafter be the county seat of such county. If the election be held to move the county seat from a point more than' five miles from the geographical center to a point within five miles of such center, then the county seat shall be moved to the place receiving a majority of all the electors in the county voting at such election, and such place shall thereafter be the county seat of such county."

Article 1595, same Statutes, provides:

"No county seat situated within five miles of the geographical center of any county shall be removed except by a vote of two-thirds of all the electors in said county voting on the subject; nor shall any county seat be removed from a point more than five miles from the geographical center of any county to any other point more than five miles from such center, nor from a point within five miles of the geographical center to any other point within five miles of such center, except by a two-thirds vote of all the electors in said county voting on the subject. No person shall be allowed to vote except he be a bona fide citizen of the county in which he offers to vote. A majority of said electors, however, voting at such election may remove a county seat from a point more'than five miles from the geographical center of the county to a point within five miles of such center; in either event the center to be determined by a certificate from the Land Commissioner."

Article 1601 of said Statutes then provides that it shall not be lawful for a like application to be made for the same purpose within five years thereafter.

The Legislature amended article 1601, by adding:

"* * * Provided, that an application may be made and an election held to remove the county'seat from a location more than five miles from a railroad operating as a common carrier, to a location on a railroad within two years thereafter." (Acts 40th Leg. c. 185.)

Article 9, § 2, of the Constitution of Texas provides that the Legislature shall pass laws regulating the manner of removing county seats, and the only limitation upon such power contained in the section is that no county seat situated within five miles of the geographical center of the county shall be removed except by a vote of two-thirds of all the electors voting on the subject. This section further provides that a majority of such electors voting at such election may remove

a county seat from a point more than five miles from the geographical center of the county to a point within five miles of such center, in either case, the center to be determined by a certificate from the commissioner of the general land office.

The election held and here in controversy was held before the expiration of five years after the election held on the 19th day of March, 1925, and after the expiration of two years from said date. There is no question but that Pampa was on a railroad operating as a common carrier, and that Le Fors was more than five miles from any such railroad.

In the case of Winder v. King, 1 S.W.(2d) 587, the Commission of Appeals holds that the Legislature, when it passed the amendment to article 1600 above quoted, intended to restrict such elections to a period after the expiration of two years from the date of the last preceding election, and that by the provision, "within two years," the Legislature intended to provide that such election could not occur until "after two years." This decision, however, is, to our minds, a recognition of the legality of such election, if held after two years from the date of the last election.

It is true that the point here at issue was not expressly decided in that case by the Commission of Appeals, but it is hardly probable that the Commission of Appeals would have held as they did hold in face of a constitutional provision by which there was vested in the particular locality chosen as the county seat the right to retain the same for a period of five years.

Be that as it may, the contention that a vote of the people locating the county seat locates same for a period of five years, and that no legal election can be held within that period, we refuse to sustain. It has long been held in this state that no citizen of the county has a vested right in the location of a county seat by reason of his residence in the county and could not maintain an action contesting such election for that reason. Walker v. Tarrant County, 20 Tex. 16; Alley v. Denson, 8 Tex. 297; Harrell v. Lynch, 65 Tex. 146. It is true that the Legislature, recognizing the fact that a wrong might be perpetrated, for which there was no remedy, provided by article 3069 that any resident of the county could maintain such contest. But this was not based on the theory that any individual or county had a vested right by reason of such location, but in order that a remedy might be furnished whereby fraudulent elections, other than for the purpose of electing officers, might be contested.

There can, in reason, be no ground for the contention that the Legislature, by enacting article 1601, supra, fixed a definite period in which another election could not be held, and thereby deprive subsequent legislators of the power to legislate fixing a different period. We take it that the question is rather analogous to the question of the power of the

Legislature to alter a period of limitation in the holding of land. Where a party had possession of land, claiming same under 10 years' statute of limitation and before the ten years had expired, he having held the land in a greater amount than 160 acres, and the Legislature having changed the quantity of land which could be claimed under naked possession from 640 acres to 160, it was held that he was thereby deprived of his right to assert limitation to the larger acreage, notwithstanding the law at the time of his entry into possession and possession thereof of the larger tract for a period of 9 years, 6 months, and 24 days of the 10 years.

But the appellants contend that the question here presented is analogous to the question decided by our courts in the matter of holding local option elections, and that the Legislature was powerless to amend article 1601, changing the time until after the effect of the election of 1925, settling the question for five years, had passed. To sustain this contention, they cite Dawson v. State, 25 Tex. App. 670, 8 S. W. 820; Ex parte Meyer, 84 Tex. Cr. R. 288, 207 S. W. 100.

Answering this contention, we quote from appellee's brief and adopt such quotation as a part of this opinion:

"Briefly, we will call attention to the reasons why we think that this case is not in point. The legislative act there under consideration owed its origin to section 20, art. 16, of the Constitution, which provided, not what the Legislature should do itself in the way of determining the local option question, but that the Legislature was directed to provide a manner by which the people could *from time to time* by election enact this legislation themselves. "When the Legislature vested in the people authority to do that thing for a certain length of time, and the people did that very thing for that definite and fixed term, this act of legislation so enacted by the people for a definite term was then beyond the power of the Legislature to recall. In other words, the people were delegated with that power, and, having acted in the exercise of that power, the matter was fixed and determined in accordance with this legislative act of the people. Whereas, article 1601 of the Revised Civil Statutes, which was in force on March 19, 1925, owed its origin to section 2, art. 9 of the Constitution, which attempted to delegate no power in the Legislature to delegate to the people of the county the authority to enact legislation. The power at all times to enact this legislation was retained in the Legislature, and the only limitation placed upon the Legislature was that they should not provide any manner in removing county seats except that under certain circumstances it was necessary in the event those conditions existed for it to be done by the vote of the people. In all other respects the Legislature had full and complete authority. Had the Legislature seen fit from time to time to enact legislation that would provide for the moving of county seats from one point within five miles of the geographical center of the county to another point within five miles of the geographical center of the county, without the intervention of any election whatever, it would have been consistent with the provision of the Constitution. The Legislature had complete authority to retain control of all laws, regulating the manner in removing county seats, with the exception in section 2, mentioned at any time, and this legislation could be amended without reference to any other power of the Legislature itself.

"On the other hand, under the provisions of section 20, art. 16, the Legislature was required to vest the authority in the voters to determine "from time to time" whether the sale of intoxicating liquors should be prohibited within certain limits, and, the Legislature having delegated that authority, and the people having acted upon it, in accordance with the authority vested in them, the Legislature then lost control of the subject during that time, in accordance with the provision of the Constitution itself. Not so on the subject of the time within which the people could vote on the question of removing the county seat. We think the constitutional provisions are entirely different."

■ The contention that no certificate from the commissioner of the general land office was ever shown to have been issued, locating the center of the county as required by the Constitution, and such certificate not having been introduced in evidence rendered the election invalid, we cannot sustain. We hold that it was not necessary in this case, for the reason that the record shows that Pampa, as a candidate for the location of the county seat, received more than two-thirds of the votes cast in the election. Conceding that Le Fors was within the five-mile radius of the center of the county and that Pampa was outside that radius and was more than five miles distant from such center, what purpose could be served by the introduction of such certificate? We take it that the answer to appellants' contention is that, Pampa having received more than the constitutional majority which would require the certificate to have been obtained and recorded, its production and introduction in evidence was unnecessary and immaterial.

■ Appellants charge that the election which is herein contested was illegal because no election was ordered on that date in precinct No. 9, Gray county, Tex. Appellee contends that there was no such precinct, for the reason that the steps taken to create precinct No. 9 were abandoned before completion; that it was contemplated that precinct No. 9 be created, but no published notice of such precinct was ever given and no certified copy of such order was ever delivered to the tax collector of Gray county; that the persons residing within the proposed boundaries of said precinct No. 9 were given tax receipts entitling them to vote in precinct No. 2; and that such voters did vote in precinct No. 2 at the election held on March 9, 1928.

While we are inclined to think that the alleged precinct No. 9 was never brought into existence, because of the failure to comply with the statutes as to published notice and

delivery of copy of same to the tax collector, we do not deem it necessary to so decide.

There is no evidence that any voter residing in the limit of the proposed precinct No. 9 was denied the privilege of voting in the election. Neither is it shown that any illegal votes were cast in said election unless they were illegal voters because of the fact that they voted in the named precinct No. 2 after the creation of precinct No. 9 out of a portion of said precinct No. 2. We cannot sustain appellants' contention as to this.

In the case of Ex parte White, 33 Tex. Cr. R. 594, 28 S. W. 542, where election precincts of a town were laid off from the courthouse square, the courthouse not being included in any of them, and the election was held in different rooms in the courthouse, it was held that the constitutional provision that electors should vote "in" the precinct of their residence did not invalidate the election, this even though the casting of the ballots occurred at a point outside the precinct.

The town of San Marcos was incorporated and divided into four wards, and the commissioners' court of Hays county, in which county San Marcos was located, established but two election precincts and these without reference to the wards.

Judge Gaines, speaking for the Supreme Court in the case of Davis v. State, 75 Tex. 420–432, 12 S. W. 957, 961, says:

"Was it the purpose of article 1665 of the Revised Statutes not only to direct that the Commissioners' Courts should make each ward of an incorporated town, village, or city a voting precinct, but also to provide that in the event of their failure to do so the election as to precincts affected by such failure should be declared a nullity? The main design of all election laws is, or should be, to secure a fair expression of the popular will in the speediest and most convenient manner; and we think a failure to comply with provisions not essential to attain that object should not avoid the election, in the absence of language clearly showing that such was the legislative intent.

"But there is no express declaration in the statute that a failure of the Commissioners' Court to make each ward an election precinct shall avoid the election. Nor does it contain any words from which it should be necessarily implied that such was the intention. If such is the meaning of the law, it must be arrived at by construction. It may be conceded that the one purpose of the provision was to prevent illegal voting. The Constitution required that each voter should vote in his precinct. Hence the provision that each ward of a town or city should constitute a precinct made it necessary that each voter should cast his vote in the vicinity where as a general rule his qualifications to vote were best known. So far it tended to secure the purity of the ballot box. Consideration of public policy may in part have led to the enactment of the statute. On the other hand, it may have been inserted merely for the convenience of the voters living in incorporated towns and cities."

For the reason that no fraud was shown in the election, and that it was not shown that any voter was deprived of a vote and that no voter was permitted to vote who was not a qualified voter, we refuse to hold that the legal voters who resided within the boundaries of the old district No. 2, but whose residence was also in precinct No. 9, were disfranchised by the failure to order an election and to provide a polling place in the new district No. 9.

We have carefully examined the record and all propositions presented in the brief, and, finding no reversible error, we affirm the judgment of the trial court.